# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| HERBERT MILTON | ) | |
| Plaintiff, | ) | |
| | ) | No. 07 C 3892 |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | Magistrate Judge |
| | ) | Martin C. Ashman |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Herbert Milton ("Milton"), seeks judicial review of a final decision of Defendant, Michael J. Astrue, Commissioner of Social Security ("the Commissioner"), denying his application for Supplemental Security Income ("SSI") benefits under the Social Security Act, 42 U.S.C. § 401 *et seq.* Currently before the Court are Milton's motion for summary judgment and the Commissioner's cross-motion for summary judgment. The parties have consented to have this Court conduct any and all proceedings in this case, including the entry of final judgment, pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1(c). For the reasons set forth below, the Court denies Milton's motion, grants the Commissioner's cross-motion, and affirms the Commissioner's final decision.

### I. Background

Herbert Milton was born on May 19, 1972, and was raised in Chicago by his mother. (R. at 172, 242.) He attended school through the eighth grade, although he claimed in his interview with a consulting physician that he was "pushed ahead" even though he could not read. (*Id.* at 242.) The parties agree that Milton has no relevant prior employment experience. When asked

how he survived without any income, he reported that he was "staying from place to place." (*Id.* at 241.) In 1999, he was imprisoned in Louisiana for molesting a thirteen-year-old child. (*Id.*) A letter provided to the ALJ by the Morehouse Parish (Louisiana) Jail, where Milton was incarcerated, indicates that he was able to perform all of the activities of daily living while incarcerated. (R. at 273.) While incarcerated, Milton received medical treatment for "a stitch left in his right elbow that had abscessed." (*Id.*) Nonetheless, he was able to work in the prison kitchen cutting, chopping, and slicing vegetables and meats. (*Id.*) He was released on August 26, 2005, and applied for SSI benefits on August 29, 2005. (*Id.* at 388, 172-74.) His alleged date of disability was August 26, 2005. (*Id.* at 172-74.)

On September 28, 2005, Milton saw Dr. Harley Rubens, who performed a psychiatric evaluation for the Bureau of Disability Determination Services. (R. at 241.) Although his claim for disability was apparently based on mental problems, Dr. Rubens noted that Milton "ha[d] not had psychiatric care in, before, or after being in prison." (*Id.*) Thus, Dr. Rubens's evaluation is the first medical evidence in the record regarding Milton's allegedly disabling condition. Milton's chief complaint was that he was scared to be around large numbers of people and that he was paranoid and worried that someone would physically attack him. (*Id.*) He reported having dreams about prison and stated that he stayed in his brother's apartment all day. (*Id.* at 241-42.) Milton said that he could not cook or clean and that his daily activities consisted of watching television all day. (*Id.* at 242.) He reported that he had used cocaine and alcohol on a daily basis from the age of thirteen until he went to prison, but denied using drugs or alcohol since his release. (*Id.*) Milton also stated that he had pins in his right arm because he had broken his

elbow when he was eleven years old. (*Id.* at 241.) Dr. Rubens diagnosed Milton with "Possible Mild Transient Posttraumatic Stress Disorder," noting that the symptoms might be transient, as Milton had only been out of prison—where his fears were justified—for approximately one month. (*Id.* at 243-44.) Dr. Rubens also found that Milton had "a clear antisocial personality disorder." (*Id.* at 244.)

Milton's record, including Dr. Rubens's September 28 report, was reviewed for the state agency by Ronald Havens, Ph.D. (R. at 245-258.) Dr. Havens considered Milton's impairments in three categories—"anxiety-related disorders," "personality disorders," and "substance addiction disorders." (*Id.* at 245.) Relying on Dr. Rubens's findings, Dr. Havens found that Milton had possible transient post-traumatic stress disorder, antisocial personality disorder, and a history of drug abuse. (*Id.* at 250, 252, 253.) However, Dr. Havens concluded that Milton's impairments were not severe and that Milton had only mild functional limitations in "Activities of Daily Living," "Maintaining Social Functioning," and "Maintaining Concentration, Persistence, or Pace." (*Id.* at 255.) Dr. Havens's report was dated October 6, 2005; on October 7, 2005, Milton's claim for disability benefits was denied. (R. at 245, 125.)

Beginning on October 27, 2005, Milton sought treatment for his mental conditions at the Bobby E. Wright Comprehensive Behavioral Health Center. (R. at 33.) His primary complaint, according to his intake assessment, was auditory hallucinations and paranoid ideations. (*Id.* at 35.) He reported hearing voices as well as a fear of crowds and small spaces, an inability to go outside alone, and panic attacks. (*Id.*) Milton also discussed his past history of drug abuse and the beatings he received while incarcerated. (*Id.* at 36.) The intake assessment form reveals a

diagnosis of panic disorder and psychotic disorder. (*Id.* at 38.) Milton's Global Assessment of Functioning ("GAF") score was forty-five, indicating "serious symptoms" or "serious impairment in social, occupational, or school functioning." (*Id.*; DSM IV-TR 32 (4th Ed. 2000).) He also underwent a medical examination on October 27, 2005, during which he complained of problems with his right wrist and elbow as well as headaches and hearing problems. (R. at 56-57.)

Milton returned to the Wright Center on December 2, 2005, and his psychiatrist, Dr. Marri, completed an "Initial Psychiatric Evaluation and Treatment Plan." (R. at 52-55.) Milton was diagnosed with post-traumatic stress disorder and described as "antisocial." (*Id.* at 55.) Dr. Marri prescribed him Zoloft, Risperdal, and Benadryl. (*Id.* at 52.) In terms of therapy, Dr. Marri recommended support groups, including life skills, anger management, and substance abuse groups. (*Id.*) Dr. Marri indicated that Milton should see a medical doctor for his headaches and have a urine drug screen. (*Id.* at 53.) The section of the form titled "Prognosis" is marked "poor." (*Id.*) Progress notes indicate that five months later, in May 2006, Milton was still reporting an intense fear of crowds leading to overwhelming feelings of panic. (*Id.* at 82.)

Milton also pursued medical treatment for his physical ailments. At the Near West Family Health Center, he was treated by Dr. Lilia DeLeon beginning in January 2006. (R. at 96-111.) Milton's medical chart indicates several diagnoses in the period from January 2006 through August 2006, including hypertension, depression, and elevated cholesterol. (*Id.* at 96.) Milton was prescribed the antibiotic amoxicillin and hydrocortisone cream at various times, though it is unclear what conditions these were intended to treat. (*Id.* at 99, 102.) Milton also reported that he suffered a seizure in February 2006, for which he received Depakote. (*Id.* at 103.) In January

2006, the record appears to show that Milton mentioned something about his right elbow, although the nurse's note says "Pt here regarding his blood pressure" and the only diagnosis listed is "hypertension." (*Id.* at 105.)

In January 2006, Milton underwent a consultative physical examination performed by Dr. Norma Villanueva. (R. at 274.) Milton reported that he had a history of seizures, specifically that "he was told when he was in the hospital he had blank spells for about 5 minutes," adding that "[h]e feels tired and sleepy, occurring about 2 times per week." (*Id.*) He also complained of a "leaking" right arm, stating that he had fractured his right elbow when he was eleven and had surgery at Cook County Hospital. (*Id.* at 275.) In addition to his right elbow problem, Milton reported pain in his right wrist that prevented him from lifting things or opening a jar. (*Id.*) Dr. Villanueva diagnosed Milton with a "possible absence seizure disorder," tendinitis in his right wrist, possible arthritis in his right hip, and a possible fistula on his right elbow. (*Id.* at 276.) Dr. Villanueva noted that Milton had a mass on his right arm with "2 small holes with serous[1] drainage" and a healed surgical scar. (*Id.*) She also observed that Milton could not turn a circular door knob or pick a small piece of paper up off the table and that he had a limited range of motion in his right elbow and right hip. (*Id.* at 278.) X-ray imaging revealed a bone deformity, possibly due to an old fracture, in Milton's elbow, but no acute injury or soft tissue abnormality. (*Id.* at 280.) X-rays of Milton's hips revealed no abnormality. (*Id.*)

On October 5, 2006, a hearing was held before Administrative Law Judge ("ALJ")

---

[1] "Of, relating to, or resembling serum; *esp*: of thin watery constitution." Merriam Webster's Collegiate Dictionary (11th ed. 2003).

Michael R. McGuire. Milton testified that he did not go to work once he was released from jail because he "couldn't," explaining that "[i]t was like [he] couldn't move" and "didn't know what was happening." (R. at 388-89.) He stated that he cannot breathe when he is around a crowd of people, that his heart begins beating rapidly, and that his hands start sweating. (*Id.* at 389.) Milton also reported hearing voices and having nightmares. (*Id.* at 394.) When the ALJ asked Milton whether he would be able to function in a setting where he was "not in total isolation, but where you don't have to interact with other people or be in a crowd," Milton said that he would. (*Id.* at 390.) When asked why he did not look for a job "where you didn't have to be in a crowd," Milton replied: "Well, for one, I ain't got no transportation." (*Id.*) He also testified that he applied for a job at McDonald's even though he does not go to restaurants because of the crowds, indicating that he only applied so that he could tell his family that he had looked for a job "so they'll get off my back." (*Id.* at 391-93.) Milton admitted that he had not seriously looked for work, but explained that "when I try to go outside, I can't make it no further than the front door." (*Id.* at 393.)

Milton also testified that his medication made him so sleepy that he would normally go to bed at nine in the evening and wake up at two in the afternoon. (R. at 394-95.) He reported that his daily activities consisted of watching television and that sometimes he would sleep all day. (*Id.* at 397-98.) He stated that he was depressed because his mother was seriously ill and because of his "foot to mouth [sic]" lifestyle. (*Id.* at 398.) Milton said he was worried that, if he were to get a job, he might have a panic attack and "hurt somebody." (*Id.*) As an example of a situation where he felt panicked around large numbers of people, he described a homecoming party that

his friend's family had for him when he was released from jail. (*Id.* at 399-401.) According to Milton, being in a room with twelve people was overwhelming and he had to leave the party. (*Id.* at 401.)

When the ALJ asked Milton whether he could perform janitorial work, Milton answered that he was not sure whether he could do such a job and mentioned that he had physical limitations that could prevent him working as a janitor. (R. at 404-05.) He testified that he had fractured his arm when he was eleven years old, that it was repaired with pins, and that he could turn his arm one way but not the other. (*Id.* at 405.) Milton also mentioned problems with blackouts and seizures. (*Id.* at 409.) When the ALJ asked him why he had not been diagnosed with or treated for seizures, Milton testified that his medical card was "restricted," indicating that he had "just found out" that he could not use it to go to the hospital and that he did not know where else he could use the medical card. (*Id.* at 410.)

Vocational Expert ("VE") Julie Bose also testified at the October 5, 2006, hearing. (R. at 420.) The ALJ first asked the VE to assume an individual with Milton's age, education, and work background with no physical limitations. (*Id.* at 421.) The ALJ further posited that this individual could have no contact with the public and only limited contact with coworkers or supervisors. (*Id.*) The VE testified that such an individual could perform several jobs in the Chicago area at the medium exertional level of unskilled labor, including Industrial Cleaner (approximately 6,000-6,400 jobs), Night Crew Clerk (approximately 3,300-3,600 jobs) and Dishwasher (approximately 3,000-3,300 jobs). (*Id.*) The ALJ modified this hypothetical to add the restriction that the individual could not work in close proximity with more than five to ten

people at a time. (*Id.* at 422.) The VE testified that this would not preclude employment, but would reduce the available positions by ten to twenty percent. (*Id.*) The ALJ also asked whether an individual with Milton's age and background who could not have any contact with coworkers or supervisors would be able to perform jobs available in the Chicago metropolitan area. (*Id.*) The VE stated that "[t]here is no unskilled work activity where you could avoid at least superficial contact with supervisors and co-workers . . . . So that would eliminate work altogether." (*Id.*)

On December 20, 2006, the ALJ issued his opinion denying Milton's claim for SSI benefits. (R. at 11.) Milton timely filed a request for review accompanied by a brief from his attorney; the request was denied by the Social Security Administration's Appeals Council on June 1, 2007, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 4.) It is to that decision that the Court now turns.

## II. The ALJ's Decision

The ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since August 26, 2005, the alleged onset date.

2. The claimant has the following severe impairments: post traumatic stress disorder and bipolar disorder.

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4. After careful consideration of the entire record, [the ALJ found] that the claimant has no exertional limitations. However, the claimant should have limited contact with co-workers and supervisors with no work in proximity to more than five to 10 people and no

contact with the public.

5. The claimant has no past relevant work.

6. The claimant was born on                    , and was 33 years old, which is defined as a younger individual age 18-44, on the date the application was filed.

7. The claimant has an eighth grade education and is able to communicate in English.

8. Transferability of job skills is not an issue because the claimant does not have past relevant work.

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10. The claimant has not been under a "disability," as defined in the Social Security Act, since August 29, 2005, the date the application was filed.

(R. at 13-17.)

### III. Discussion

### A. Standard of Review

This Court will uphold the ALJ's decision "if it is supported by substantial evidence and is free of legal error." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002) (citing 42 U.S.C. §405(g)). Substantial evidence is evidence that "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In reviewing the ALJ's decision under the substantial evidence standard, this Court will not reweigh the evidence or substitute its judgment for the judgment of the Commissioner. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). However, the Court will not act as a "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Rather, this Court must ensure

that the ALJ has articulated his analysis of the case at some minimal level. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This means that the ALJ's decision must build "an accurate and logical bridge from the evidence to [his] conclusion." *Steele*, 290 F.3d at 941 (internal quotation and citation omitted). It also requires that the ALJ "confront evidence that does not support his conclusion and explain why it was rejected." *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2002). If the ALJ's decision does not meet these minimum requirements because the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review," this Court will reverse and remand the decision. *Steele*, 290 F.3d at 940.

### B. The Five-Step Inquiry for Benefits Determination

In order to qualify for disability benefits, a claimant must demonstrate that she is disabled. An individual is considered to be disabled when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A claimant is considered to be "unable to engage in substantial gainful activity" when she is unable to perform her previous work or engage in any other kind of substantial work that exists in the national economy. 42 U.S.C. § 423(d)(2)(A). In order to determine whether a claimant is disabled under the statute, the ALJ employs a five-step inquiry:

> In the first step the ALJ considers the applicant's present work activity. Second, the ALJ weighs the severity of the applicant's impairment. The impairment or combination of impairments must

> severely restrict an applicant's physical or mental ability to perform
> basic work activities or an ALJ should enter a finding of not
> disabled. Third, the ALJ decides whether the impairment or
> combination of impairments meets or equals an impairment listed
> within the regulations which are conclusively disabling. If an ALJ
> is unable to make a disability determination in the first three steps,
> then the process proceeds to an assessment of the applicant's
> residual functional capacity (RFC). At the fourth step, the ALJ
> determines whether the RFC prevents the applicant from
> performing his or her past relevant work. If not, in the fifth and
> final step the ALJ uses the assessment of RFC to determine if the
> applicant can make an adjustment to other work based on the
> applicant's age, education, and work experience.

*Arnold v. Barnhart*, 473 F.3d 816, 820-21 (7th Cir. 2007) (internal citations omitted). The claimant has the burden of proof as to the first four steps, while at step five the burden shifts to the Commissioner to show that the claimant's residual functional capacity allows her to do some work within the national economy. *Clifford*, 227 F.3d at 868.

In this case, the ALJ found that Milton had not engaged in substantial gainful activity since the alleged onset of his disability and that his impairments, post-traumatic stress disorder and bipolar disorder, were severe. (R. at 13.) However, the ALJ found that Milton's impairments did not meet or medically equal a listed impairment and that, although he had no relevant work experience, Milton retained the necessary RFC to perform several jobs existing in the relevant geographical area. (*Id.* at 14-17.) Therefore, he concluded that Milton was not disabled. (*Id.* at 17.) Milton alleges that there are several bases upon which to reverse the ALJ's decision. First, Milton argues that the ALJ committed reversible error by conducting Milton's hearing in an adversarial manner. Next, Milton argues that the ALJ failed to supply an appropriate rationale for his determination that Milton's testimony was not credible. Third,

Milton argues that the ALJ impermissibly relied on his own medical opinion rather than that of a qualified medical expert in determining that Milton was not disabled. Finally, Milton asserts that the ALJ committed reversible error when he failed to request an updated medical expert opinion regarding Milton's alleged disability. The Court addresses these arguments in turn.

### C. The Adversarial Nature of the Proceeding

Milton's first argument for reversal is that the ALJ impermissibly conducted Milton's disability hearing in an adversarial manner. The transcript of the October 5, 2006, hearing supports Milton's assertion that the ALJ demonstrated a somewhat antagonistic attitude toward him. As Milton's brief notes, the ALJ repeatedly emphasized that Milton had not tried very hard to find a job. (Pl.'s Br. at 8-9.) At times, his remarks were not even questions. In response to Milton's testimony that he applied for a job at McDonald's even though he did not go to restaurants, the ALJ said: "So . . . you called about a job in MacDonald's [sic] even though you say you can't go to restaurants because there are too many people. So that wasn't really a very realistic effort." (R. at 392.) Similarly, when Milton stated that he could not go outside, the ALJ remarked, "Okay. Except for today, apparently." (*Id.* at 393.) When Milton testified that he was depressed because he had no money and had to "bow down and kiss [people's] butt" to get what he needed, the ALJ said, "Well, there's another alternative. You could get a job." (*Id.* at 398.) At other times, the ALJ asked questions that reflected impatience and disbelief. When Milton testified that he experienced panic when he was in large groups of people and couldn't move, the ALJ replied "What are you talking about, too many people? Too many people you can't move? When have you ever been in a situation when there have been too many people that can't move,

that you pushed them out of the way?" (*Id.* at 399.) When Milton gave the example of a homecoming party that was thrown for him, the ALJ replied "Oh, this family that doesn't like you had a homecoming party?," referring to Milton's earlier testimony that his family did not like him. (*Id.*) As Milton's testimony revealed, the ALJ had incorrectly assumed that it was his family that threw the party when it was actually his friend. (*Id.*)

These examples suffice to show that the ALJ's conduct arguably fell short of the standard of even-handed impartiality. In this case, Milton was represented by counsel at his hearing. Nonetheless, disability proceedings before an ALJ are not considered "adversarial." *See Sullivan v. Hudson*, 490 U.S. 877, 891 (1989). Furthermore, "[a] well-settled proposition regarding social security disability hearings is that it is a basic obligation of the ALJ to develop a full and fair record." *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991) (internal quotes and citation omitted). In this case, to paraphrase the Seventh Circuit, "[t]he ALJ's impatience with [Milton's] testimony . . . comes across on the cold, black and white page when he phrases his questions in a leading, cross-examining style that is inappropriate in a nonadversarial social security hearing." *Nelson v. Apfel*, 131 F.3d 1228, 1236 (7th Cir. 1997). However, as the Seventh Circuit indicated in *Nelson*, where an ALJ fully develops the factual record and "the relevant evidence about [the claimant's] condition still manage[s] to find its way into the record," there is no basis to remand the case. *Id.* Milton does not argue that the record was not fully developed or point to any relevant evidence that the ALJ failed to uncover due to the nature of his questioning. Therefore, while the ALJ's demeanor was perhaps regrettable, Milton was not legally prejudiced, and remand is not required.

## D. The ALJ's Credibility Determination

Milton argues that the ALJ's decision must be reversed because the ALJ failed to provide an adequate rationale for his conclusion that Milton's testimony was "not entirely credible." (R. at 13.) An ALJ's credibility determination is a finding of fact, and, as such, is entitled to special deference from a reviewing court. *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004). Because the ALJ is in the best position to observe witnesses and determine their truthfulness, the Court will only overturn the ALJ's credibility determination if it is patently wrong. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). In this case, the Court finds that the ALJ's credibility determination was not patently wrong.

SSR 96-7p requires the ALJ to specify the reasons for his credibility determination "so that the applicant and subsequent reviewers will have a fair sense of the weight given to the applicant's testimony." *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003). Milton argues that the ALJ's reasons were insufficient because the ALJ relied only on the fact that Milton testified that he could work as a night janitor. The Commissioner, by contrast, argues that Milton's admission was a valid basis for the ALJ's conclusion. Both parties miss the more important point, which is that Milton never affirmatively stated that he could perform the duties of a night janitor. Milton stated, "If I could get a job working at nighttime where there ain't no people around, I'll work." (R. at 414.) When the ALJ asked, "With all the problems that you've got, do you think you could do that?," Milton replied, "I don't know. I could try." (*Id.*) When asked again whether he could do the job, his reply was similarly equivocal: "If I could find [such a job], yeah. And know how to do the job, yeah." (*Id.*) The Court finds that this is not the

damning admission of an actual present ability to perform a night janitor job that the Commissioner believes it to be. Furthermore, as Milton's brief points out, there is no reason to believe that Milton, who had never been employed at any job in his life, had any basis upon which to opine regarding his ability to fulfill the requirements of a particular job.

Nonetheless, there is no need to remand the case, because Milton is incorrect in arguing that the night janitor remark was the only basis for the ALJ's finding that Milton's testimony was not credible. First, the Court notes that the ALJ credited some of Milton's testimony. In his decision, the ALJ expressly found that Milton could not work with the public or with a large number of co-workers, consistent with Milton's testimony regarding his anxiety problems. (R. at 14.) In making this finding, the ALJ highlighted aspects of Milton's testimony that he apparently found credible. (*Id.*) However, the ALJ also noted that Milton's testimony regarding his inability to perform basic daily activities was contradicted by statements he made to his treaters at the Bobby E. Wright Center indicating that he could cook and clean, as well as by a letter from the correctional facility where he resided for six years indicating that he had worked intensively in the prison kitchen. (*Id.*) Similarly, the ALJ credited Milton's testimony that large groups of people made him anxious but also noted Milton's testimony that he would not be anxious if he was not in a situation where he was surrounded by large numbers of people. (*Id.* at 14-15.) Thus, the ALJ's determination that portions of Milton's testimony were not credible was not based solely on Milton's testimony regarding the night janitor position, and the evidence that the ALJ did rely on was sufficient to support his conclusion that parts of Milton's testimony were not credible.

### E. Improper Medical Opinion

Milton next argues that the ALJ erred by substituting his own medical opinion for that of a qualified expert. Milton correctly observes that "judges, including administrative law judges . . . must be careful not to succumb to the temptation to play doctor," *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990), and that an ALJ may not substitute her own medical opinion for the opinion of a qualified expert. *Rousey v. Heckler*, 771 F.2d 1065, 1069 (7th Cir. 1985). But Milton fails to identify what aspect of the ALJ's decision he believes represents an improper medical opinion. Rather, Milton focuses on the argument that the ALJ erred "by providing almost no discussion of the claimant's numerous visits to his psychiatrist and therapist which describe [sic] ongoing symptoms despite treatment." (Pl.'s Br. at 11.) Thus, his true objection appears to be that the ALJ's reasoning, as developed in his decision, is insufficient.

The Court rejects this argument. The Court reviews the ALJ's decision under a deferential "substantial evidence" standard and will not substitute its judgment for the ALJ's or reweigh the evidence. *See Clifford*, 227 F.3d at 869. The ALJ's decision will stand so long as it is free from legal error and the ALJ provides a minimal articulation of his reasons that builds a "logical bridge" between the facts of the case and his conclusions. *Steele*, 290 F.3d at 941. The ALJ's decision acknowledges Milton's diagnoses from his treatment at the Bobby Wright Center and discusses several progress notes from his ongoing treatment there. (R. at 15.) The ALJ based his conclusion regarding Milton's limitations and ability to work in part on that evidence, and also discussed specific aspects of Milton's medical and psychiatric consultative examinations. (*Id.* at 15.) The ALJ determined that Milton did have some mental impairments,

but relied on the opinion of Dr. Havens, a medical consultant, who found that Milton had only mild impairments in several functional categories. (*Id.*) Significantly, Dr. Havens was the only medical expert to opine directly on the issue of disability.

Similarly, the ALJ acknowledged that Milton's complaints of elbow and wrist pain were substantiated by some of Dr. Villanueva's findings, but noted that Milton had not sought treatment for his elbow problem since he applied for disability. (R. at 15.) Therefore, the ALJ gave little weight to the alleged elbow problem in making his disability determination. (*Id.*) Milton argues that he did seek medical treatment "for several conditions including hypertension, and problems with his right arm." (Pl.'s Br. at 12.) Medical progress notes indicate that Milton was treated for hypertension on several occasions. (R. at 96.) However, aside from Dr. Villanueva's examination (which was part of the disability proceeding rather than a course of medical treatment initiated by Milton), Milton's medical records do not indicate that he ever attempted to pursue any treatment for his elbow, even as he was treated for other problems and was being prescribed antibiotics and skin creams. (R. at 96, 99, 102, 103.) Therefore, it was reasonable for the ALJ to infer that, while Milton may have had an elbow problem, it was not particularly serious.

As the foregoing demonstrates, the ALJ's justification of his conclusions acknowledged relevant evidence that was favorable to Milton and articulated the reasons for his specific findings. Therefore, his decision must be upheld under the deferential "substantial evidence" standard of review.

## F. Failure to Obtain an Updated Medical Opinion

Milton's final argument is that the ALJ committed reversible error by failing to obtain an updated medical opinion regarding whether Milton's impairments met or equaled a listed impairment, rendering him disabled. Milton is correct in stating that "when an updated medical judgment as to medical equivalence is required at the ALJ level, the ALJ must call upon the services of its [sic] medical support staff." (Pl.'s Br. at 12.) However, Milton makes no showing that this predicate—the need for an updated opinion—was met in this case. Milton's argument appears to be based on the fact that all of his psychiatric treatment took place after Dr. Havens rendered his consultative opinion. However, SSR 96-6p, upon which Milton relies, merely provides that an ALJ must obtain an updated opinion when (1) the ALJ or Appeals Council believes that a judgment of equivalence may be reasonable based on information already in the record; or (2) new medical information is received that, in the opinion of the ALJ or Appeals Council, may change the consulting expert's opinion. As this Court has noted before, "[i]n both circumstances the ALJ must be of the opinion that a finding of medical equivalence may be reasonable" in order to trigger the requirement of an updated opinion. *Young v. Apfel*, 1999 WL 354776, *6 (N.D. Ill. May 27, 1999). The ALJ evidently did not believe that this was the case, and, as discussed above, the ALJ's position was supported by substantial evidence. Therefore, the ALJ was not required to obtain an updated medical opinion.

## G. Substantial Evidence

At the end of his brief, Milton resurrects the "substantial evidence" argument already discussed in section III.E above. As discussed in that section, substantial evidence supports the

ALJ's findings with respect to Milton's physical and mental impairments. The fact that Milton disagrees with the weight the ALJ gave to certain evidence is immaterial at this stage, because the reviewing Court does not reweigh the evidence. Rather, the ALJ's opinion will be upheld so long as it is supported by "substantial evidence," meaning evidence that "a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. As this opinion makes clear, the ALJ's decision meets that standard, and is therefore upheld.

## IV. Conclusion

For the reasons stated above, Milton's motion for summary judgment is denied, the Commissioner's cross-motion for summary judgment is granted, and the ALJ's decision denying Milton's claim for SSI benefits is affirmed.

**ENTER ORDER:**

Dated: July 28, 2008

**MARTIN C. ASHMAN**
United States Magistrate Judge